# Exhibit A

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | | |
|---|---|---|
| REALD SPARK, LLC, | § | |
| Plaintiff, | § | |
| v. | § | C.A. No. 2:22-cv-00942-TL |
| MICROSOFT CORPORATION, | § | |
| Defendant. | § | |

REBUTTAL EXPERT REPORT OF JOSEPH W. MARKS, PH. D.

HIGHLY CONFIDENTIAL – SOURCE CODE
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

## III. SUMMARY OF OPINIONS

### A. The Asserted Trade Secrets are Not Protectable Trade Secrets

16. RealD has not established that the Asserted Trade Secrets (i.e., each category of know how identified by Dr. Saber as RealD's claimed trade secrets, including the [redacted] are protectable trade secrets. On the contrary, it is my opinion that the Asserted Trade Secrets are merely general and public knowledge and well known to a POSITA at all relevant times. The asserted "know-how" and "negative know-how" by RealD's experts consist of widely disclosed concepts, design choices, methodologies, and problem-avoidance practices that are well known in the computer vision and machine learning field and widely discussed in academic publications, open-source repositories, industry standards, and other documentation. My understanding is that information that is generally known or readily ascertainable through proper means such as public availability cannot qualify as a trade secret.

17. The techniques and decisions characterized as "know how" or "negative know-how" reflect routine engineering tradeoffs and commonly understood constraints. A competent practitioner in the field of computer vision and machine learning could and would have arrived at the same or better decisions through routine knowledge, literature review, benchmarking, or standard experimentation. My understanding is that concepts and methods that are readily ascertainable or publicly available to anyone in a field are not trade secrets.

18. RealD and Dr. Saber have not established nor provided evidence that the Asserted Trade Secrets provided any kind of independent economic value or competitive advantage to RealD. They have not demonstrated that the alleged information derives independent economic value from not being generally known. For example, they have not identified evidence of

licensing, monetization, competitive differentiation, or revenue attributable to the specific alleged "know-how" or "negative know-how." The evidence of record that I have reviewed leads me to the opposite conclusions that the Asserted Trade Secrets are methods well known to anyone in the field and provide no economic value to RealD. It is documented throughout this report that the concepts were widely and publicly available in the field, including by way of Skoltech and RealD (among many others).

19. RealD has not provided any specific evidence of testing, experimentation or research and development that led to the decisions to use any of the specific Asserted Trade Secrets. RealD's experts have not presented any contemporaneous documentation demonstrating that the alleged "know-how" or "negative know-how" was derived from substantial, unique, or proprietary research and development. For example, I am not aware of laboratory records, design logs, controlled experiment data, or internal technical memorandum evidencing experimentation that would distinguish the specific Asserted Trade Secrets from standard industry knowledge. My expectation is that if RealD's Asserted Trade Secrets actually reflected meaningful "know how" or "negative know how", then there would be substantial evidence of documentation and failed experiments to arrive at decisions to use those well-known methods. Instead of finding evidence of "know how" or "negative know how," my opinion is that the Asserted Trade Secrets are all standard industry knowledge and it would not require a POSITA to undertake research or experimentation to arrive at decisions to use these well-known methods. Neither Dr. Saber nor Mr. Wilk identify or cite any such specific evidence, which supports my conclusion that the Asserted Trade Secrets are, in fact, not protectable trade secrets.

**B. <u>No Misappropriation</u>**

20. [redacted]

24. Overall, it is my opinion that RealD's and Dr. Saber's assertions of trade secret misappropriation are not true and contrary to the evidence available to me. In my opinion, RealD's and Dr. Saber's assertions are an attempt to convert well-known standards, industry knowledge and professional experience into claims of trade secret misappropriation.

25. For much the same reasons, it is my opinion that Microsoft never "used or disclosed RealD's confidential information in order to develop its own products, including the Microsoft Surface Pro X," as alleged in RealD's breach of contract claim. Microsoft's accused eye gaze correction software (including training data and capture of the same) did not rely on RealD's Asserted Trade Secrets concepts/methods. Therefore, it is my opinion that Microsoft did not breach any agreement with RealD by using or disclosing any confidential information from RealD.

[redacted]

[redacted]

*Id.* at MSFT_00305495-503.

77. [redacted]

Thus, it is my opinion that there could be no misappropriation of any know-how or negative

know-how by Microsoft for a project that was based on Microsoft's longstanding knowledge and experience in this field, as well as because [redacted].

78. [redacted]

[redacted]

MSFT_00278028 at 31 (July 24, 2019)

[redacted] [redacted]

[redacted] [redacted]

[redacted]

[redacted]

[redacted] [redacted]

159. Based on my review of the evidence available to me, it is my opinion that the [redacted] identified by Mr. Wilk are not trade secrets because they cannot be distinguished from Skoltech or public technology. [redacted].

160. [redacted]

---

30 [redacted]

31 [redacted]

## VII. REBUTTAL TO DR. SABER'S OPINIONS

### A. Summary

170. [redacted]

171. As discussed in detail below and explained throughout my report, these categories are widely known, long standing, and public concepts in the computer vision field. They were not developed by RealD and could not be considered the fruit of any specific experimentation or research by RealD. That is, these categories reflect publicly available, broadly implemented concepts, which do not derive any economic value from being secret. Further, RealD has not demonstrated that it undertook any experimentation or R&D, much less substantial experimentation, regarding any of the categories that RealD asserts Microsoft then avoided by using RealD's know-how. In contrast, the evidence I have reviewed reflects that Microsoft undertook its own independent (and significant) development to create their own eye gaze correction solution.

172. The sections below address each asserted trade secret and demonstrate why they were not RealD's know-how or negative know-how, and why Microsoft could not (and did not) misappropriate any such alleged trade secret. To the extent RealD claims that its alleged trade secret consists of using all of its claimed design choices in combination, the same is true. It was well within the domain knowledge of a computer vision engineer to use the asserted design choices together in a variety of ways. As I point out in Section VII.H, many real world examples disclose use of these design choices in combination, which confirms that doing so is not a trade

secret. Microsoft further could not have (and did not) rely on anything RealD allegedly developed because several of the relevant decisions relating to each category were made before Drs. Sommerlade and Neophytou joined Microsoft, foreclosing any inference that the combination was taken from RealD.

**B.** [redacted]

[redacted]

[redacted] [redacted]

[redacted]

[redacted]

225. For the reasons above, it is my opinion that: (i) [redacted] and is not trade-secret 'know-how'; and (iii) Microsoft's use of [redacted] is consistent with public, Microsoft-affiliated work and the broader industry's reliance on [redacted]. Neither Microsoft's decision to use [redacted], nor its work to [redacted] (which were different from those at RealD/Skoltech), demonstrate trade secret misappropriation.

**D.** [redacted]

[redacted] [redacted]

226. [redacted] This [redacted] was not know-how or negative know-how developed by RealD.

227. [redacted]."[75]

228. [redacted]

---

75 [redacted]

[redacted]. In my opinion, this decision was not RealD developed know-how or negative know-how.

229. [redacted] In my opinion, merely reading relevant articles and applying the teachings in those articles cannot be claimed as know-how or negative know-how. [redacted]

230. [redacted]

[redacted]

RDSPARK_0054542

236. [redacted].

237. [redacted].

238. [redacted]

[redacted] This understanding is common and readily known to anyone in computer vision and machine learning. It is therefore not RealD's know-how. [redacted] In my opinion, this is general knowledge and not RealD know-how.

239. [redacted].[81]

240. Based on my discussion with Dr. Pradeep on January 13, 2026, I understand that Microsoft [redacted]

[81] [redacted]

[redacted].

245. [redacted] I disagree that RealD's use of [redacted] would be considered know-how or negative know-how. [redacted]

246. [redacted]

83 [redacted]

[redacted]

247. I disagree with Dr. Saber's opinion that using these tools was a RealD trade secret, know-how or negative know-how. [redacted]

**E.** [redacted]

248. [redacted]

249. In my opinion, using [redacted] can hardly be considered know-how or negative know-how. [redacted]

250. [redacted].[86]

[84] [redacted]

[redacted]

252. I disagree with Dr. Saber's opinion that [redacted] would be a trade secret or RealD's know-how.

**F. <u>Dataset and Annotations</u>**

1. *RealD's datasets are based on public information and are not know-how.*

253. [redacted].

254. [redacted].

255. [redacted]

[redacted]

310. [redacted]

2. *RealD's Asserted Trade Secrets have no independent economic value.*

311. As discussed above, I understand that a trade secret must derive independent economic value from being a secret. But as I have also explained throughout this report, RealD's Asserted Trade Secrets were all public knowledge. Thus, because RealD's Asserted Trade Secrets were well known, they cannot derive any economic value for being kept secret.

312. [redacted]

313. I further understand that independent economic value must confer a competitive advantage to RealD. The Asserted Trade Secrets do not, in my opinion, confer any kind of competitive advantage to RealD. [redacted]

314. RealD has also failed to demonstrate that it undertook significant research and development efforts sufficient for a claim of trade secret. [redacted] I therefore disagree that Microsoft economically benefited from RealD's efforts in any way.

315. Based on the evidence I have reviewed, none of the work performed at RealD offered it a competitive advantage because SocialEyes was discontinued for lack of commercial success even before Drs. Sommerlade and Neophytou joined Microsoft. [redacted] It is therefore my opinion that due to the nature of underlying technical concepts being in the public domain and the fact that [redacted], the know how that RealD claims as its trade

secrets lacks any independent economic value. In the absence of independent economic value, the claimed know how cannot qualify as a trade secret.

316. As I have explained throughout this report, RealD's alleged trade secrets were all public knowledge. Thus, because RealD's purported trade secrets were well known, they cannot derive any economic value for being kept secret.

3. *RealD's did not take reasonable measures to protect trade secrets.*

317. I understand that a trade secret owner must take reasonable measures to keep their information secret. Even if RealD's trade secrets were not public knowledge, RealD has not made efforts to protect their purported trade secrets.

318. [redacted]

319. [redacted]

[redacted]

RDSPARK_0052156

320. Therefore, even if RealD's trade secrets were not in the public domain, RealD has not made efforts to protect their purported trade secrets.

4. [redacted]

321. [redacted]

322. [redacted].

323. [redacted].

324. [redacted]

- [redacted]
- [redacted]

---

95 [redacted]

## VIII. REALD'S BREACH OF CONTRACT CLAIM

329. I am aware that RealD included a claim for breach of contract in its complaint. It appears that RealD's breach of contract claim is based on Microsoft allegedly breaching its NDA with RealD by "disclosing RealD's confidential information, including, without limitation, RealD's trade secrets related to SocialEyes. RDSPARK_0009377 (NDA between Microsoft and RealD). For example, upon information and belief, Microsoft used or disclosed RealD's confidential information in order to develop its own products, including the Microsoft Surface Pro X." Complaint, pages 10-11.

330. [redacted].

331. Based on all of the evidence I have reviewed, it is my opinion that Microsoft never "used or disclosed RealD's confidential information in order to develop its own products, including the Microsoft Surface Pro X," as alleged in RealD's breach of contract claim.

332. My reasons for expressing this opinion are set forth throughout this report. As set forth in detail throughout my report, Microsoft's accused eye gaze correction software does not include any of RealD's Asserted Trade Secrets concepts/methods, nor does Microsoft's training data or collection of the training data. Therefore, it is my opinion that Microsoft did not breach any agreement with RealD by using or disclosing any confidential information from RealD.

## IX. CONCLUSION

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed in Boston, Massachusetts on this 16th day of February, 2026.

Joseph Marks

JOSEPH MARKS, PH.D

[redacted]

359. Later in my investigation, I briefly spoke to Dr. Pradeep a second time (by videoconference) on February 10, 2026. I also interviewed Drs. Sommerlade and Neophytou by

videoconference on February 13, 2026. During the course of our discussions, cited throughout this report, we discussed each of the five technical areas where RealD is alleging "know how" that it claims was misappropriated. I waited to interview Drs. Sommerlade and Neophytou until after I had reviewed the available documentary evidence and had a chance to evaluate RealD's source code. My discussion with Drs. Sommerlade and Neophytou confirmed my opinions as summarized in the substantive portion of this report. In particular, the categories identified by RealD ([redacted]) are not trade secrets because they were all publicly disclosed prior to Drs. Sommerlade and Neophytou's transition to Microsoft. Any allegations of use by Microsoft of RealD's Asserted Trade Secrets would have been industry standard and commonly used by a POSITA. Lastly, Microsoft independently developed its own eye gaze correction technology from scratch and did not utilize any Trade Secret from RealD that would not have been public or industry standard.

360. I reviewed, at a high level, the following interrogatory responses:

- Defendant's First Set of Interrogatories to Plaintiff RealD Spark, LLC (No. 1), dated December 2, 2022;
- RealD's Objections and Responses to Microsoft's First Set of Interrogatories (No. 1), dated January 3, 2023;
- RealD's First Supplemental Objection and Responses to Microsoft's First Set of Interrogatories (No. 1), dated January 31, 2023;
- RealD's Second Supplemental Objection and Responses to Microsoft's First Set of Interrogatories (No. 1), dated June 7, 2023;
- RealD's Third Supplemental Objection and Responses to Microsoft's First Set of Interrogatories (No. 1), dated October 17, 2023 and Verification dated November 11, 2025;
- RealD's Fourth Supplemental Objection and Responses to Microsoft's First Set of Interrogatories (No. 1), dated September 26, 2025;
- RealD's Fifth Supplemental Objection and Responses to Microsoft's First Set of Interrogatories (No. 1), dated December 12, 2025;
- Defendant's Third Supplemental Objections and Responses to RealD's First Set of Interrogatories to Microsoft (Nos. 1-12), dated January 29, 2014; and
- RealD's Second Supplemental Responses to Microsoft's Second Set of Interrogatories (Nos. 2-16) dated October 16, 2025.

[redacted]

465. [redacted]

During my discussion with Drs. Sommerlade and Neophytou, we discussed their understanding of the duties owed to RealD at the conclusion of their employment. Discussion with E. Sommerlade, and A. Neophytou, 2/13/2026. They informed me, consistent with their deposition testimony, that from the date they were terminated by RealD on October 8, 2018, there was a six-month period during which they did not work on eye gaze correction. Neophytou Dep., 43:8-44:5; 46:19-25 ([redacted]); Sommerlade Dep., 52:4-53:10 [redacted]); 54:6-8 ("A. [redacted].").

466. [redacted].[163]

[163] [redacted]

[redacted]

MSFT_00010481

467. I also discussed with Dr. Pradeep on February 10, 2026, restrictions that Microsoft placed on Drs. Sommerlade and Neophytou on a 6 month "stand down period" when they joined Microsoft on February 4, 2019 as an extra caution. Discussion with V. Pradeep, 2/10/2026; RDSPARK_0010843; Pradeep Dep., 235:1-238:7 ([redacted]"); 198:8-200:7 ("[redacted]."), 202:2-204:11. Dr. Pradeep explained the steps that Microsoft took to ensure the operational integrity of its activities relating to gaze correction (activities that I discuss throughout this report) by enforcing the following restrictions on Drs. Sommerlade and Neophytou for six months from the date of termination by RealD. I understand that the six month "stand down period" ran from the date of termination by RealD in October 2018 through early in April 2019.

468. Dr. Pradeep indicated that Microsoft enforced the following internal measures to ensure that there was no misuse of RealD proprietary information:

- [redacted]

[redacted]

- [redacted]
- [redacted]

469. Contrary to the unsupported statements made by Mr. Wilk, I have not seen evidence that Dr. Sommerlade or Dr. Neophytou engaged in any restricted activities as identified above during the "stand down period" imposed by Microsoft.

470. I have reviewed Mr. Wilk's opinions in sections VII.A-VII.D, including, for example, Mr. Wilk's opinions that Dr. Sommerlade downloaded source code, that Drs. Sommerlade and Neophytou began working on eye gaze correction prior to the date permitted in the contracts with RealD, that Drs. Sommerlade and Neophytou violated their NDAs with RealD, and that Drs. Sommerlade and Neophytou misrepresent themselves as experts in their fields. I am not aware of any expertise that Mr. Wilk has to make opinions related to contractual issues, NDAs, or misrepresentations of qualifications. My understanding is that Drs. Sommerlade and Neophytou did not provide confidential RealD information to Microsoft at any time. Neophytou Dep., 237:5-14, 238:18-239:20 ([redacted]); Sommerlade Dep., 234:12-235:14 ([redacted]); MSFT_00243650 [redacted]).

[redacted]

MSFT_00243650

471. The above is entirely consistent with my opinions in this report and with all of the evidence that I have reviewed that Drs. Sommerlade and Neophytou did not use any trade secret information from RealD in developing the accused software at Microsoft.

472. [redacted].

473. [redacted] Similar to the allegations discussed above, Dr. Sommerlade has already provided testimony on these topics (Sommerlade Dep., 217:23-225:4; *see also id.* at 225:16-252:2; 256:5-259:16), and Drs. Sommerlade and Neophytou will be best positioned to explain the details of their termination and subsequent wind down from RealD, including the reasons why no information was misappropriated from RealD following their termination. MSFT_00243650 ([redacted]

[redacted]"); MSFT_00335843 ([redacted]).